UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

DAVID L. MOORE, M.D., and                    )
COMMUNITY HEALTH CARE CLINICS, INC.,   )
                                             )
                Plaintiffs,                  )
                                             )
v.                                           )      No.:   3:07-CV-484
                                             )             (VARLAN/GUYTON)
JOHN DEERE HEALTH PLAN, INC.,                )
JOHN DEERE HEALTH CARE, INC., and           )
DR. CHRISTINE PETTY,                         )
                                             )
                Defendants.                  )


## <u>MEMORANDUM OPINION</u>

This civil action is before the Court on defendants' Motion for Summary Judgment [Doc. 39]. Plaintiffs David L. Moore, M.D. and Community Health Care Clinics, Inc. ("CHCCI") have filed a response to this motion [Doc. 42]. Defendants have filed a reply to the response [Doc. 44]. This motion is now ripe for the Court's consideration.

## I.    Background

Plaintiffs filed the complaint in this case on December 28, 2007 [Doc. 1].[1] In that complaint, plaintiffs allege as follows: Dr. Moore is a medical doctor licensed to practice medicine in Tennessee [*Id.*, ¶ 3]. CHCCI is a corporation organized under Tennessee law to provide physician services [*Id.*, ¶ 4]. CHCCI is a multi-specialty group, and has offices

---

[1] The complaint, as well as the motion papers in this case, refer at various points, and with some degree of interchangeability, to the allegations of "Dr. Moore," "CHCCI," and "plaintiffs." The Court adopts the same liberality of usage with respect to the originator of each of the claims in this case in its memorandum opinion.

in Oliver Springs, Knoxville, and Columbia [*Id.*, ¶ 5]. CHCCI was organized and operated under the control of a community advisory board, which had fiduciary responsibilities, and which exercised corporate decision making functions [*Id.*]. CHCCI was a lookalike community health care center [*Id.*].

Defendant John Deere Health Care, Inc. ("defendant John Deere") is a Delaware corporation authorized to do business in Tennessee [*Id.*, ¶ 6]. Defendant John Deere Health Plan, Inc. ("defendant Health Plan") is an Illinois health insurance company licensed to do business in Tennessee [*Id.*, ¶ 7]. After being granted managed care organization ("MCO") status by Tennessee, defendant Health Plan took over the patients of a bankrupt MCO called Xantus [*Id.*].

Larry Brakebill, M.D. is of the full age of majority and is a resident of Tennessee [*Id.*, ¶ 8]. At all times relevant to this case, Dr. Brakebill was the Medical Director for defendant Health Plan [*Id.*, ¶ 9].[2] Defendant Christine A. Petty, M.D. is of the full age of majority, and is an Illinois resident [*Id.*, ¶ 10]. At all times relevant to this case, Dr. Petty was the Vice President of Medical Management for John Deere Health [*Id.*, ¶ 11].[3]

TennCare is a Tennessee program funded by state and federal dollars [*Id.*, ¶ 13]. Under TennCare, Tennessee contracts with private insurance companies to provide medical services to Medicaid beneficiaries through a mandatory managed care system [*Id.*]. On or

---

[2] Dr. Brakebill was originally named as a defendant in this case. He was terminated as a defendant on May 29, 2008.

[3] Plaintiff's complaint does not specify whether "John Deere Health" refers to defendant John Deere, defendant Health Plan, or both.

about an unspecified date, defendant Health Plan entered into a contractor risk agreement (the "risk agreement") with Tennessee [*Id.*, ¶ 14]. Defendant Health Plan administers and fulfills its obligations under the risk agreement with Tennessee [*Id.*, ¶ 15].

MCOs like defendant Health Plan are responsible for organizing a network of providers to offer medical services to Medicaid beneficiaries [*Id.*, ¶ 16]. As such, these MCOs operate the administrative services for Tennessee's Medicaid program, and have a close nexus with Tennessee [*Id.*]. Defendant Health Plan's TennCare program was implemented to improve Tennessee's Medicaid program, and receives state and federal funds [*Id.*, ¶ 17]. Defendant Health Plan is subject to certain requirements under Tennessee law, the terms of the risk agreement, and other TennCare rules and requirements [*Id.*, ¶ 18].

All of CHCCI's physician employees were individually credentialed providers with defendant Health Plan [*Id.*, ¶ 20]. Each licensed, credentialed provider had his or her own individual obligations and responsibilities to CHCCI's patients, for whom each provider individually treated and rendered services, and to the entity by which he or she was individually credentialed [*Id.*]. Defendant Health Plan did not assign Dr. Moore any patients from its TennCare program [*Id.*].

At all times relevant to this case, because CHCCI was a community health center lookalike, a board of ten community members held fiduciary responsibility over CHCCI's operations [*Id.*, ¶ 21]. Mike Anderson was the Administrative Director of CHCCI [*Id.*]. Mr. Anderson was responsible for the day-to-day operations and management of CHCCI [*Id.*].

His responsibilities included paying bills, hiring front office employees, hiring back office employees, and overseeing patient billing [*Id.*].

Before entering into a provider agreement with defendant Health Plan, CHCCI had established doctor-patient relationships with various patients whose MCO was called Xantus [*Id.*, ¶ 23]. In 1999 and/or 2000, Xantus filed for bankruptcy [*Id.*]. All Xantus patients were thereafter assigned by Tennessee to defendant Health Plan for purposes of TennCare administration only, the patients already being patients of CHCCI's various physicians [*Id.*]. After becoming the MCO of these patients, and prior to February 6, 2001, defendant Health Plan sought to involuntarily reassign these patients to other providers not practicing at CHCCI [*Id.*]. Dr. Moore and CHCCI protested this involuntary reassignment effort [*Id.*]. Tennessee prohibited defendant Health Plan's involuntarily reassignment plan, and most patients remained at CHCCI [*Id.*].

Effective February 6, 2001, defendant Health Plan entered into a provider agreement with Dr. Moore and other CHCCI physicians to become a TennCare Network Physicians Provider for the purpose of providing medical care to patients insured by defendant Health Plan under the risk agreement [*Id.*, ¶ 24]. Defendant Health Plan also entered into provider agreements with each of the other CHCCI providers [*Id.*]. After becoming a provider with defendant Health Plan, Dr. Moore noticed that other TennCare insurance companies maintained a patient assignment list, followed childhood immunizations and adult preventive care, and provided these data to primary care physicians and clinics as required by the TennCare program [*Id.*, ¶ 25]. Defendant Health Plan did not follow childhood

4

immunization and adult preventive care, or provide such data to primary care physicians [*Id.*].

Beginning in the winter of 2001, Dr. Moore informed defendant Health Plan and its administrative staff that his duties centered around fundraising and the hospital service at the University of Tennessee Medical Center in Knoxville [*Id.*, ¶ 26]. Defendants nevertheless continued to address complaints to, and sanction Dr. Moore for, the actions or inactions of other defendant Health Plan credentialed physicians [*Id.*, ¶ 27]. From in or about November 2002 through June 2003, defendants sent Dr. Moore letters regarding alleged patient complaints, and sanctions based upon those complaints [*Id.*, ¶ 28]. Dr. Moore informed defendant Health Plan, Dr. Brakebill, and Ms. Lora Fretwell, the Quality Improvement Coordinator at defendant Health Plan, that he had little or no contact with the alleged complaining patients [*Id.*]. Dr. Moore suggested that defendant Health Plan address complaint letters to the appropriate attending physicians [*Id.*]. Throughout this period, Dr. Moore, Mr. Anderson, and other physician employees of CHCCI submitted letters of explanation and other information to defendants in response to these allegations [*Id.*, ¶ 29].

Defendants persisted in their actions against Dr. Moore [*Id.*, ¶ 30]. On or about June 13, 2003, in a letter to Ms. Fretwell, Dr. Moore informed defendants that, "In the future to speed the processing of these letters please address to Community Health Care Clinics PC, attention the Oliver Spring [sic] Clinic, the Columbia Medical Clinic, or The Prince Medical Center location. Further clarify the correct Primary Care Physician" [*Id.*, ¶ 31].

In or about April or May 2003, at the request of other physicians and staff members at CHCCI, Dr. Moore informed the Tennessee Center of Medicare Services, Darin J. Gordon of the Tennessee Department of Finance and Administration, and Dr. Leigh Binkley, a TennCare physician representative, that defendant Health Plan failed to maintain a patient assignment list, failed to inform CHCCI of childhood immunizations, and failed to inform CHCCI of adult preventive care [*Id.*, ¶ 32]. In or about May or June 2003, Dr. Brakebill and Ms. Margaret Farage, another Quality Improvement Coordinator at defendant Health Plan, began to allege that Dr. Moore was receiving numerous complaints from patients, and subsequently conducted an audit of CHCCI's Knoxville and Oliver Springs offices [*Id.*, ¶ 33]. Throughout defendants' investigation, Dr. Moore continued to inform Dr. Brakebill and Ms. Fretwell that he had little or no contact with the patients in question, and suggested that they address complaint letters to the appropriate attending physician [*Id.*, ¶ 34].

As to each of the complaints made by defendants against Dr. Moore, Dr. Moore was either out of the country, or was not the patient's treating physician [*Id.*, ¶ 35]. Dr. Moore never established a doctor-patient relationship with any of the complaining patients [*Id.*]. From May 20, 2002 through July 1, 2002, and again from December 12, 2002 through April 26, 2003, Dr. Moore was in South Africa, and did not treat defendant Health Plan patients [*Id.*, ¶ 37].

Dr. Moore was asked to relay to defendant Health Plan the problems that CHCCI's staff was having initiating referrals to specialists as a result of the scarcity of specialists, as well as patient concerns about traveling long distances for appointments with specialists and

at CHCCI [*Id.*, ¶ 38]. These concerns pertained to the services rendered by various other credentialed physicians at CHCCI, and were not related to Dr. Moore's services [*Id.*, ¶ 44]. In or about July or August 2003, Dr. Moore complained to Ms. Farage that defendant Health Plan was not complying with ¶¶ 2-3.b.1 and 2 of the risk agreement regarding the accessibility of care to TennCare enrollees [*Id.*, ¶ 39]. Under ¶ 2-3.b.1, defendant Health Plan is required to develop a network of primary care physicians through which patients can obtain medical services by only having to travel thirty minutes or thirty miles to seek treatment [*Id.*, ¶ 40]. Under ¶ 2-3.b.2, defendant Health Plan is further required to develop a network of specialists sufficient to administer the needs of TennCare enrollees [*Id.*, ¶ 41].

Between its two clinic locations in Knoxville and Oliver Springs, CHCCI processed approximately 6,000 to 7,000 defendant Health Plan patient visits per year [*Id.*, ¶ 45]. Of the approximately 12,000 to 14,000 defendant Health Plan patients seen between the years 2001 and 2003, defendants identified eighteen alleged patient complaints against Dr. Moore [*Id.*, ¶ 46]. Of these complaints, none of them were regarding medical services provided by Dr. Moore [*Id.*, ¶ 47]. Of the identified complaining patients, only one had been treated by Dr. Moore [*Id.*, ¶ 48]. Two were never seen by providers at CHCCI [*Id.*]. One patient indicated that she had not filed a complaint [*Id.*].

In or about September or October 2003, Dr. Moore received a letter from Dr. Brakebill dated September 29, 2003, informing him that a meeting would be held on October 14, 2003 to review Dr. Moore's cases and complaints [*Id.*, ¶ 50]. Dr. Moore was not able to be present to defend himself or exercise his rights at the October 14, 2003 meeting [*Id.*, ¶ 53].

During the October 14, 2003 meeting, the recommendation was made to terminate Dr. Moore's contract [*Id.*, ¶ 54]. This recommendation was forwarded to Dr. Petty [*Id.*]. On or about October 31, 2003, Dr. Petty forwarded a notification of termination of provider agreement to Dr. Moore, which stated that the "continuation of [John Deere Health's] participation may negatively affect member care," and that, "[d]ue to the number and nature of the complaints we have received from our members, we feel it is necessary to terminate your participation status in [John Deere Health]" [*Id.*, ¶ 55].

In a letter dated November 28, 2003, Dr. Moore informed Dr. Petty that defendant Health Plan, Dr. Petty, and Dr. Brakebill had the wrong CHCCI physician, and that Dr. Moore did not receive a greater than average number of complaints regarding his services [*Id.*, ¶ 56]. In that letter, Dr. Moore further informed Dr. Petty that, as set forth in the provider agreement, it would be improper to transfer patients to other providers before an arbitration hearing could be conducted [*Id.*, ¶ 57].

Dr. Moore also forwarded to defendant Health Plan signed statements from a majority of the patients that Dr. Brakebill and Ms. Fretwell identified as having made complaints, as evidence that Dr. Moore was not their treating physician, that most had never seen Dr. Moore, and that these patients had made this known to defendant Health Plan at the time they submitted their complaints [*Id.*, ¶¶ 58-89].

In late November 2003, Dr. Moore submitted a complaint to the Illinois Department of Financial and Professional Regulation stating that defendant Health Plan had intentionally

and maliciously committed fraud [*Id.*, ¶ 60].[4] Defendant Health Plan admitted in its response to the Illinois Department of Financial and Professional Regulation that Dr. Moore was not involved in the care of defendant Health Care plan patients who made complaints [*Id.*, ¶ 61].

Defendants terminated Dr. Moore's provider agreement effective January 29, 2004 [*Id.*, ¶ 62]. Defendant Health Plan began to notify individuals and patients that Dr. Moore had been terminated as a provider under defendant Health Plan [*Id.*, ¶ 63]. Among those notified that Dr. Moore's provider contract was terminated due to issues relating to quality of care were Dr. Binkley; Mr. Gordon; and Heidi Kemmer, manager of John Deere Operations [*Id.*, ¶ 64].

The National Healthcare Integrity and Protection Data Bank (the "NHIPDB") was established pursuant to the Health Insurance Portability and Accountability Act of 1996 as a flagging system to receive and disclose certain final adverse actions against health care practitioners, providers, and suppliers [*Id.*, ¶ 65]. Health plans and government agencies are required to report information regarding licensure and certification actions, exclusions from participation in federal and state health care programs, criminal convictions, and civil judgments related to health care to the NHIPDB [*Id.*, ¶ 66]. Federal and state government agencies and other health plans access the NHIPDB [*Id.*, ¶ 67].

On or about February 11, 2004, Dr. Petty submitted an adverse action report concerning Dr. Moore to the NHIPDB [*Id.*, ¶ 68]. The adverse action report stated that Dr.

---

[4] This section of plaintiffs' complaint is erroneously numbered "59, 61, 60, 61, 62."

Moore's status as a provider under defendant Health Plan was terminated due "to the number and nature of complaints received from health plan members," and due to his "failure to meet or comply with contractual obligations or participation requirements" [*Id.*, ¶ 71]. The adverse action report was submitted before a final decision of an arbitrator was reached pursuant to Dr. Moore's provider agreement with defendant Health Plan [*Id.*, ¶ 74].

Dr. Moore has been afraid to apply for admission to the panels of other insurance companies, medical plans, and with government agencies–specifically, the Los Angeles County Sheriff's Department, the California Department of Corrections, and the Federal Bureau of Prisons–for fear of rejection due to defendants' report to the NHIPDB [*Id.*, ¶ 83]. Dr. Moore has passed the initial exams and completed the interview process for the above-named agencies, but has declined to submit the final application paperwork because of this fear of rejection [*Id.*, ¶ 84]. Dr. Moore has requested that defendant Health Plan retract or correct the current entry pending the outcome of this litigation [*Id.*]. Defendant Health Plan has refused to do so [*Id.*].

Defendants informed enrollees to defendant Health Plan's TennCare coverage that defendants would no longer pay for services rendered at CHCCI [*Id.*, ¶ 85]. Defendants informed individuals insured under John Deere's private health insurance programs that it would no longer pay for services rendered at CHCCI [*Id.*, ¶ 86].

On the basis of these allegations, plaintiffs bring four claims: defamation, tortious intentional interference with current business relationships, breach of contract, and a request

for injunctive relief [Doc. 1, ¶¶ 92-159].[5]  Plaintiffs seek an order directing defendants to remove the entry they made to the NHIPDB, with notice contained in the release that prior releases were issued in error; declaring that the alleged patient complaints were not against Dr. Moore, and that it was unfounded and unjust for defendants to attribute them to him; and requiring defendant Health Plan to reinstate Dr. Moore's provider agreement to provide medical services to defendant Health Plan TennCare enrollees and defendant John Deere Health private insureds [*Id.*, ¶¶ 166a-c].  Plaintiffs also seek actual damages, punitive damages, attorney's fees, and costs [*Id.*, ¶ 166d].

Defendants filed their motion for summary judgment [Doc. 39] and memorandum in support [Doc. 40] on December 22, 2009.  In their motion, defendants contend that the "undisputed evidence in this case clearly establishes that each of the [d]efendants is entitled to immunity on each of [p]laintiffs' claims because each claim is based upon peer review conduct that is protected under the" Health Care Quality Improvement Act of 1986 (the "HCQIA") and the Tennessee Peer Review Law of 1967 (the "TPRL") [Doc. 39].  Defendants further contend that, even if defendants are not immune from liability under the HCQIA and the TPRL, no genuine issue of material fact exists with regard to any of the substantive claims in this case, and summary judgment as a matter of law is therefore appropriate [*Id.*].

---

[5] Dr. Moore styles his fourth claim "injunctive relief" [*see* Doc. 1, ¶¶ 149-59].  As discussed *infra* Part III.B.4, however, this is properly categorized as a request for relief, not as a separate cause of action.

Plaintiffs filed a response to the motion for summary judgment [Doc. 42] and a memorandum in support [Doc. 43] on January 9, 2010. Plaintiffs contend that defendants are not entitled to immunity under either the HCQIA or the TPRL, and that genuine issues of material fact exist with respect to each of plaintiffs' claims [Doc. 42]. Defendants filed a reply on January 19, 2010 addressing the arguments in plaintiffs' response to the motion for summary judgment [Doc. 44].

The Court has carefully considered the motion for summary judgment, the memorandum in support, the response, the memorandum in support of the response, and the reply, in light of the underlying pleadings and the applicable law. For the reasons that follow, defendants' motion for summary judgment will be granted.

## II. Standard of Review

Summary judgment is proper only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of establishing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n.2 (1986). The Court views the facts and all inferences to be drawn therefrom in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Kiefer*, 310 F.3d 937, 942 (6th Cir. 2002). To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable finder of fact could find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 248 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.*

The judge's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question for the factfinder. *Id.* at 250. The judge does not weigh the evidence or determine the truth of the matter. *Id.* at 249. Thus, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for a trial–whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

## III. Analysis

Defendants contend that the "undisputed evidence in this case clearly establishes that each of the [d]efendants is entitled to immunity on each of [p]laintiffs' claims because each claim is based upon peer review conduct that is protected under the" HCQIA and the TPRL [Doc. 39]. Defendants further contend that, even if defendants are not immune from liability under the HCQIA and the TPRL, no genuine issue of material fact exists with regard to any of the substantive claims in this case, and summary judgment as a matter of law is therefore appropriate [*Id.*]. Plaintiffs disagree with both arguments [Doc. 43]. The Court considers these arguments below.

### A.    HCQIA and TPRL Immunity

Defendants first argue that the HCQIA and the TPRL establish a rebuttable presumption that defendants' peer review actions in this case are entitled to immunity. The Court treats the question of immunity under each statute separately.

### 1.    HCQIA

In order for immunity to apply under the HCQIA, the professional review action must be taken:

(1)    In the reasonable belief that the action was in the furtherance of quality health care;

(2)    After a reasonable effort to obtain the facts of the matter;

(3)    After adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances; and

(4)    In the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).

42 U.S.C. § 11112(a). "A professional review action shall be presumed to have met the preceding standards necessary for [immunity] . . . unless the presumption is rebutted by a preponderance of the evidence." *Id.* If immunity applies, neither the professional review body, nor any person who participates with or assists the body with respect to the action, may be liable for damages under any law of the United States or of any State with respect to the action. *Id.* § 11111(a)(1).

The standard of review in cases involving § 11112(a) is "unconventional." *Peyton v. Johnson City Med. Ctr.*, 101 S.W.3d 76, 83 (Tenn. Ct. App. 2002). In these cases, even though defendant is the moving party, the Court must "examine the record to determine whether the plaintiff has 'satisfied his burden of producing evidence that would allow a reasonable jury to conclude that the [defendant's peer review action] failed to meet the standards'" set forth in § 11112(a). *Id.* (quoting *Brader v. Allegheny Gen. Hosp.*, 167 F.3d 832, 839 (3d Cir. 1999)). The Court's role at this point in the litigation is not to determine whether the peer review action was correct. *Peyton*, 101 S.W.3d at 83.

Defendants contend that they are entitled to immunity from money damages pursuant to the HCQIA because the procedure by which Dr. Moore's contract with John Deere was terminated is a covered professional review action, and because Dr. Moore has failed to show by a preponderance of the evidence that this review action did not satisfy the four-prong test [Doc. 40]. Dr. Moore contends that defendants have failed to satisfy the four-prong test [Doc. 43]. The Court considers each prong separately below.

### a. Reasonable Belief that the Action was in Furtherance of Quality Health Care

Dr. Moore may defeat immunity by demonstrating by a preponderance of the evidence that the peer review action in this case was taken in the absence of a reasonable belief that the action was in furtherance of quality health care. 42 U.S.C. § 11112(a)(1). The Court applies an objective standard of reasonableness in determining the sufficiency of the basis of defendants' action. *Peyton*, 101 S.W.3d at 78. This standard is "satisfied 'if the

reviewers, with the information available to them at the time of the professional review action, would reasonably have concluded that their actions would restrict incompetent behavior or would protect patients.'" *Id.* at 84 (quoting H.R. Rep. No. 99-903, at 10 (1986)).

In support of his argument that defendants took the peer review action in this case in the absence of a reasonable belief that the action was in furtherance of quality health care, Dr. Moore contends that defendants have presented no evidence regarding the nature of the alleged complaints made by their members against Dr. Moore [Doc. 43]. He contends further that defendants never interviewed any of the other physicians or staff at CHCCI [*Id.*]. Dr. Moore contends that defendants have alleged only that complaints were made against Dr. Moore, without providing any more specific information [*Id.*]. Dr. Moore contends that defendants "cannot reasonably argue that the information available to them at the time of the review would [lead] them to believe that their actions would restrict incompetent behavior or protect patients" [*Id.*].

In response, defendants contend that Dr. Moore cannot offer proof that John Deere had no reasonable belief that its action was intended to further quality health care [Doc. 40]. Defendants contend that John Deere received numerous complaints regarding Dr. Moore's practice that were investigated and reviewed by John Deere's peer review entities [*Id.*]. They contend further that Dr. Moore can produce no proof to indicate that these reviewers could reasonably have concluded that their actions, based upon the totality of the circumstances, would further quality health care for John Deere members [*Id.*].

As defendants correctly note in their reply to Dr. Moore's response, *see* Doc. 44, and as explained by the Court, the burden is on Dr. Moore to demonstrate by a preponderance of the evidence that the peer review action in this case was taken in the absence of a reasonable belief that the action was in furtherance of quality health care. By simply pointing to alleged deficiencies in defendants' proof as to the reasonableness of this belief, Dr. Moore is attempting to reverse the burden of proof on this issue. He has offered no proof of his own to demonstrate that a reasonable belief was lacking in this case. Moreover, the proof offered by defendants suffices to establish a reasonable belief that the reviewers were acting in an effort to ensure quality health care for the members of defendant Health Plan.[6] Dr. Moore cannot, as a result, demonstrate by a preponderance of the evidence that the peer review action in this case was not based upon a reasonable belief that the action was in furtherance of quality health care. Dr. Moore has therefore failed to meet his burden under the first prong of § 11112(a).

### b.      Reasonable Effort to Obtain the Facts of the Matter

Dr. Moore may nevertheless defeat the presumption of immunity by demonstrating by a preponderance of the evidence that the peer review action in this case was taken in the absence of a reasonable effort to obtain the facts of the matter. 42 U.S.C. § 11112(a)(2). To make this determination, the Court must decide "whether 'the totality of the process leading

---

[6] Notably, "the good or bad faith of the reviewers is irrelevant." *Peyton*, 101 S.W.3d at 84. Instead, the "real issue is the sufficiency of the basis for the [peer review committee's] action." *Id.* (quoting *Bryan v. James E. Holmes Reg'l Med. Ctr.*, 33 F.3d 1318, 1335 (11th Cir. 1994)).

up to the [peer review committee's] "professional review action" . . . evidenced a reasonable effort to obtain the facts of the matter.'" *Peyton*, 101 S.W.3d at 85 (quoting *Mathews v. Lancaster Gen. Hosp.*, 87 F.3d 624, 637 (3d Cir. 1996)). Under this prong of § 11112(a), a plaintiff is entitled to "a reasonable investigation." *Peyton*, 101 S.W.3d at 85 (quoting *Egan v. Athol Mem'l Hosp.*, 971 F. Supp. 37, 43 (D. Mass. 1997)). He is not entitled to a "perfect investigation." *Peyton*, 101 S.W.3d at 85 (quoting *Egan*, 971 F. Supp. at 43). This prong is satisfied as long as "some factual investigation took place." *Peyton*, 101 S.W.3d at 85.

In support of his argument that defendants did not make a reasonable effort to obtain the facts of this matter, Dr. Moore contends that the review process conducted against him was "very limited" [Doc. 43]. He argues that no investigation was conducted by the review committee into the nature of the complaints against him [*Id.*]. He argues further that the patients who allegedly filed complaints were never interviewed [*Id.*]. He contends, in short, that defendants "had mere allegations with no evidence whatsoever to substantiate the allegations that Dr. Moore breached the standard of care" [*Id.*].

In response, defendants contend that Dr. Moore was provided with a copy of the complaints defendants received, and that Dr. Moore was further provided with a full opportunity to comment upon and offer proof related to those complaints [*Id.*]. Defendants argue that Dr. Moore responded to that opportunity by providing information that purported to indicate in some cases that he was not the specific service provider whose saw the patient making the complaint [*Id.*]. Defendants explain further that Dr. Moore's information and position was considered by each of the committees reviewing his case [*Id.*]. Defendants

contend finally that they were not persuaded to excuse these complaints, because Dr. Moore was responsible for the services offered by ancillary providers under his contract [*Id.*].

Upon review of the complaint in this case, as well as a review of several of the attachments to the parties' summary judgment filings, the Court finds that Dr. Moore has failed to show by a preponderance of the evidence that the peer review action in this case was taken in the absence of a reasonable effort to obtain the facts of the matter. Dr. Moore alleges in his complaint that he informed defendants that "he had little or no contact with the patients in question"; was "either out of the country or [] was not the [patients'] treating physician"; and provided chart notes showing the treating provider was not he [Doc. 1, ¶¶ 34, 35, 49; Doc. 43-5; Doc. 43-6]. He alleges further that, of eighteen identified complaining patients, he had only personally treated one; that two were never seen by providers at CHCCI; and that one indicated that she had not filed a complaint [Doc. 1, ¶ 48; Doc. 43-2; Doc. 43-5; Doc. 43-6]. Dr. Moore provided written documentation to John Deere making these arguments prior to the appeal hearing that occurred after the adverse action was taken against him [Doc. 39-2, ¶ 22]. He testified at that hearing to the same effect [*Id.*].

It appears to the Court that Dr. Moore's argument is not that the review board failed to consider these facts, but that the review board did not reach a decision favorable to him after considering them. In a letter to Dr. Moore dated April 30, 2003, Dr. Brakebill indicated that the Knoxville Quality Improvement Committee had "reviewed a list of complaints from 2001 and the detail of the complaints and sanctions from 2002," and determined "that one of the complaints and subsequent sanctions was for a member whose treatment was

performed by [Dr. Moore's] partner and not [Dr. Moore]" [Doc. 39-5]. But the letter noted further that the committee was "very concerned about the fact that complaints from [Dr. Moore's] practices represented about 5% of [John Deere Health Care's] total provider complaints," and that "neither [Dr. Moore] nor [Dr. Moore's] office provided timely responses or explanations about these complaints" [*Id.*]. Dr. Moore was informed that the Quality Improvement Committee would be undertaking a "detailed review . . . of all complaints received on [Dr. Moore's] practice for the next 6 months" [*Id.*].

The peer review board subsequently considered Dr. Moore's case, including Dr. Moore's position and information with respect to the complaints against him, and rejected those arguments [Doc. 39-6; Doc. 39-7; Doc. 39-9; Doc. 40]. Dr. Moore thus has not shown by a preponderance of the evidence that the review committee failed to undertake a reasonable effort to obtain the facts of this matter. Dr. Moore has not met his burden under the second prong of § 11112(a).

        **c.**       **Adequate Notice and Hearing Procedures or Such Other Procedures as are Fair to the Physician Under the Circumstances**

Dr. Moore may still defeat the presumption of immunity by demonstrating by a preponderance of the evidence that the peer review action in this case was taken in the absence of adequate notice and hearing procedures. The safe harbor provisions of the HCQIA permit a health care entity to meet the adequate notice and hearing requirements of § 11112(a)(3) with respect to a physician if it meets the following conditions:

      (1)    Notice of proposed action

The physician has been given notice stating–

(A)

      (i)     that a professional review action has been proposed to be taken against the physician,

      (ii)    reasons for the proposed action,

(B)

      (i)     that the physician has the right to request a hearing on the proposed action,

      (ii)    any time limit (of not less than 30 days) within which to request such a hearing, and

(C)    a summary of the rights in the hearing under paragraph (3).

(2)    Notice of hearing

If a hearing is requested on a timely basis under paragraph (1)(B), the physician involved must be given notice stating–

(A)    the place, time, and date, of the hearing, which date shall not be less than 30 days after the date of the notice, and

(B)    a list of the witnesses (if any) expected to testify at the hearing on behalf of the professional review body.

(3)    Conduct of hearing and notice

If a hearing is requested on a timely basis under paragraph (1)(B)–

(A)    subject to subparagraph (B), the hearing shall be held (as determined by the health care entity)–

      (i)     before an arbitrator mutually acceptable to the physician and the health care entity,

        (ii)     before a hearing officer who is appointed by the entity and who is not in direct economic competition with the physician involved, or

        (iii)    before a panel of individuals who are appointed by the entity and are not in direct economic competition with the physician involved;

(B)    the right to the hearing may be forfeited if the physician fails, without good cause, to appear;

(C)    in the hearing the physician involved has the right–

        (i)      to representation by an attorney or other person of the physician's choice,

        (ii)     to have a record made of the proceedings, copies of which may be obtained by the physician upon payment of any reasonable charges associated with the preparation thereof,

        (iii)    to call, examine, and cross-examine witnesses,

        (iv)    to present evidence determined to be relevant by the hearing officer, regardless of its admissibility in a court of law, and

        (v)     to submit a written statement at the close of the hearing; and

(D)    upon completion of the hearing, the physician involved has the right–

        (i)      to receive the written recommendation of the arbitrator, officer, or panel, including a statement of the basis for the recommendations, and

        (ii)     to receive a written decision of the health care entity, including a statement of the basis for the decision.

42 U.S.C. § 11112(b). "A professional review body's failure to meet the conditions described in" § 11112(b) "shall not, in itself, constitute failure to meet the standards of" § 11112(a)(3). *Id.* § 11112(b). Importantly, a health care facility can satisfy § 11112(a)(3) by meeting the conditions set forth in § 11112(b) or by providing "such other procedures as are fair to the physician under the circumstances." *Id.* § 11112(a)(3).

In support of his argument that defendants took the peer review action in this case in the absence of adequate notice and hearing procedures, Dr. Moore contends that "there is no evidence that the [d]efendants sent [him] a letter stating that he had a right to request a hearing" [Doc. 43]. Dr. Moore contends further that the letter sent to him on September 29, 2003 from Dr. Brakebill informing him that a meeting was to be held on October 14, 2003 to review Dr. Moore's cases and alleged complaints did not satisfy the requirements of § 11112(a)(3) because it (1) "failed to inform [him] of any professional review action proposed to be taken against him at the October 14, 2003 meeting"; (2) "failed to inform [him] of the reasons for the professional review action proposed to be taken against him at the October 14, 2003 meeting"; (3) advised him of a meeting that was to take place fewer than thirty days from the date of the letter; (4) failed to inform him of the location of the October 14, 2003 meeting or the identities of the witnesses expected to testify at the meeting; and (5) did not provide Dr. Moore with notice of his rights at the hearing [*Id.*].

Dr. Moore further contends that he replied to the September 29, 2003 letter via facsimile, expressing his intention to be present at the October meeting, and requesting directions [Doc. 43; Doc. 43-4]. Dr. Moore contends that defendants failed to provide him

with directions to the October meeting [Doc. 43]. Dr. Moore argues that, as a result of these inadequacies in the notice provided to him by defendants, he was unable to attend the hearing and defend himself at the October meeting [*Id.*].

Dr. Moore also argues that he received a letter from defendants dated October 31, 2003 informing him that the credentialing committee had accepted the recommendation of the Quality Improvement Committee to terminate Dr. Moore's contracts, and that Dr. Moore had thirty days to appeal this decision [Doc. 39-7; Doc. 43]. After Dr. Moore requested an appeal of this decision, John Deere sent Dr. Moore a letter dated November 25, 2003 providing him with notice of a December 11, 2003 hearing [Doc. 39-8; Doc. 43]. Dr. Moore alleges that this letter is deficient in all of the ways that the September 29, 2003 letter was deficient [Doc. 43].

Dr. Moore appeared in Moline, Illinois on December 11, 2003 before three physicians for his appeal hearing [Doc. 43]. The physicians conducting the appeal were not physically present, but instead appeared by telephone conference [*Id.*]. Dr. Moore argues that this made it impossible for him to present some additional evidence he had brought for the panel to review [*Id.*].

Defendants do not dispute the underlying facts Dr. Moore has cited above. Instead, they contend that the letters and hearings Dr. Moore has referenced constitute adequate notice and hearing procedures under § 11112(a)(3) [Doc. 40]. The question before the Court is thus whether a reasonable jury could find by a preponderance of evidence that the peer

review action in this case was taken in the absence of adequate notice and hearing procedures given these letters and hearings.

The Court concludes that a reasonable jury could not. Dr. Brakebill notified Dr. Moore by a letter dated September 29, 2003 that the Knoxville Quality Improvement Committee would "be reviewing [his] case and complaints at [its] next meeting," to be held on October 14, 2003 [Doc. 39-6]. That letter further directed Dr. Moore, "if he wished to attend," to contact a Mr. Bill Tullos at a phone number provided in the letter "to confirm [his] attendance" [Doc. 39-6]. The letter also indicates that, if Dr. Moore had any questions, he should let Dr. Brakebill know [Doc. 39-6].

Dr. Moore has offered no proof that he ever attempted to contact Mr. Tullos in the two weeks between his receipt of the September 29, 2003 letter and the date of the October 14, 2003 meeting. Nor has Dr. Moore offered any evidence that the confirmation of attendance he purportedly sent to Dr. Brakebill was in fact transmitted to Dr. Brakebill. The "confirmation" consists only of a copy of the September 29, 2003 letter to Dr. Moore containing the following handwritten information: "To Mrs. Buchman & Larry Brakebill M.D. 6908729 fax from Dr. Moore. I will be there, Please send directions" [Doc. 43-4]. Dr. Moore has offered no transmittal sheet or other evidence demonstrating that this request was communicated to anyone at John Deere. And he has offered no evidence that he ever

followed up with anyone at John Deere after he allegedly failed to receive directions as requested.[7]

Nor is the Court persuaded that the procedures afforded to Dr. Moore were not "fair to [him] under the circumstances." In the first place, Dr. Moore's complaints about the October 14, 2003 hearing are overriden by his absence from that hearing, as a hearing is not even required if the physician fails to appear. *See* 42 U.S.C. § 11112(b)(3)(B) ("[T]he right to the hearing may be forfeited if the physician fails, without good cause, to appear"). And his complaints about technical deficiencies at the December 14, 2003 hearing omit reference to the undisputed fact that, prior to and at that hearing, he was able to present all of the evidence to which he now points in support of his case.[8] In light of the ample opportunity afforded to Dr. Moore to make his case to the administrative review panels, the Court finds that no reasonable jury could conclude that Dr. Moore has demonstrated by a preponderance of the evidence that the peer review action in this case was taken in the absence of adequate notice and hearing procedures. *Cf. Peyton*, 101 S.W.3d at 86 (quoting 42 U.S.C. § 11112(b)) ("Whether or not the hearing could have been conducted in a better way is not relevant . . .

---

[7] Any similar notice deficiency Dr. Moore alleges with respect to the November 25, 2003 letter and the December 11, 2003 hearing is obviated by Dr. Moore's appearance at that hearing.

[8] Dr. Moore's principal complaint with respect to the December 14, 2003 hearing is that the members were unable to review additional evidence he had brought to that hearing because the hearing was conducted telephonically [Doc. 43]. Dr. Moore has offered no reason why he could not provide that evidence in advance of the hearing. Nor has he explained what sort of evidence he attempted to present, or why the this evidence could not be presented to the members of the panel over the telephone. This argument simply does not advance Dr. Moore's claim that the procedures afforded to him were not fair under the circumstances.

[as long as the physician is] provided with adequate notice and hearing procedures as were fair 'under the circumstances'"). Dr. Moore has failed to meet his burden under the third prong of § 11112(a).

### d. Whether the Action was Taken in the Reasonable Belief that the Action was Warranted by the Facts Known After Such Reasonable Effort to Obtain Facts and After Meeting the Requirement of Paragraph (3)

Dr. Moore may nevertheless defeat the presumption of immunity by demonstrating by a preponderance of the evidence that the peer review action in this case was taken in the absence of a reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of 42 U.S.C. § 11112(a)(3). 42 U.S.C. § 11112(a)(4). The "analysis under § 11112(a)(4) closely tracks [the] analysis under § 11112(a)(1)." *Meyers v. Columbia/HCA Healthcare Corp.*, 341 F.3d 461, 471 (6th Cir. 2003) (quoting *Gabaldoni v. Wash. County Hosp. Ass'n*, 250 F.3d 255, 263 n.7 (4th Cir. 2001)). Under this prong, plaintiff must show that the "facts were 'so obviously mistaken or inadequate as to make reliance on them unreasonable.'" *Meyers*, 341 F.3d at 471 (quoting *Mathews*, 87 F.3d at 638).

Dr. Moore has failed to meet his burden under this prong as well. As the preceding analysis demonstrates, defendants thoroughly reviewed Dr. Moore's case before issuing a final ruling. They considered all of the factual issues raised by Dr. Moore in the motion presently before this Court. And they heard from Dr. Moore himself at the December 14, 2003 hearing. They nevertheless concluded, "[a]fter reviewing [Dr. Moore's] comments and

file documentation," to terminate Dr. Moore as a plan provider [Doc. 39-9]. This decision reflects a determination on defendants' part that Dr. Moore's practice, which included several other physicians, negatively impacted the quality of care provided to defendants' members. Dr. Moore has failed to demonstrate the unreasonableness of this belief. As a result, he has failed to satisfy the final prong of § 11112(a).

Dr. Moore has failed to meet the burden necessary to defeat the presumption of immunity afforded to defendants under the HCQIA. Given that the grant of immunity under the HCQIA insulates defendants from suit for money damages on federal and state law claims, *see* 42 U.S.C. § 11111(a)(1) ("If immunity applies, neither the professional review body, nor any person who participates with or assists the body with respect to the action, may be liable for damages under any law of the United States or of any State with respect to the action."), the Court need not analyze defendants' immunity under the TPRL. For completeness, however, the Court now does so.

### 2. TPRL

Defendants next argue that the TPRL establishes a rebuttable presumption of immunity from money damages for the peer review action in this case. A presumption of immunity applies under the TPRL if the peer review action is taken (1) in good faith, (2) without malice, and (3) on the basis of facts reasonably known or reasonably believed to exist. Tenn. Code Ann. § 63-6-219(d)(1). "Any person alleging lack of good faith has the burden of proving bad faith and malice." *Id.* § 63-6-219(d)(3). The question before the Court is thus whether, viewing the evidence in the light most favorable to plaintiffs, plaintiffs

have offered sufficient evidence to create a genuine issue of material fact as to whether the peer review panel, in making its decision, was not acting in good faith or was possessed and motivated by malice. *Eyring v. Fort Sanders Parkwest Med. Ctr., Inc.*, 991 S.W.2d 230, 237 (Tenn. 1999). *See also Eluhu v. HCA Health Svcs. of Tenn., Inc.*, No. M2008-01152-COA-R3-CV, 2009 WL 3460370, at *7 (Tenn. Ct. App. Oct. 27, 2009) ("Despite [the] shifting of the burden of production [in TPRL] cases, this court must still view the facts in the light most favorable to the plaintiff, the nonmoving party.").

Dr. Moore contends that the TPRL's presumption of immunity is the same as the HCQIA's presumption of immunity [Doc. 43]. He thus contends that the arguments he has submitted in support of immunity under the HCQIA also apply under the TPRL [*Id.*]. Defendants respond, correctly, that the immunity provisions of the TPRL are different from those of the HCQIA [Doc. 44].[9] Defendants further contend that Dr. Moore has offered no proof of either bad faith or malice to overcome the immunity presumption under the TPRL [*Id.*].

While the Court notes that Dr. Moore has elected not to raise any specific bad faith or malice arguments in the TPRL portion of his response to defendants' summary judgment

---

[9] There is no doubt that the purposes of the HCQIA and the TPRL are the same. *See* Tenn. Code Ann. § 63-6-219(b)(1) ("In conjunction with the applicable policies of the [HCQIA], it is the stated policy of Tennessee to encourage committees made up of Tennessee's licensed physicians to candidly, conscientiously, and objectively evaluate and review their peers' professional conduct, competence, and ability to practice medicine."). The language by which each of these statutes accomplishes these purposes, however, is not. *Compare* 42 U.S.C. § 11112(a) (four-factor test for defeating presumption of immunity) with Tenn. Code Ann. § 63-6-219(d)(1) (bad faith and malice test for defeating presumption of immunity).

motion, the Court has nevertheless examined the record for allegations and proof that the peer review action was taken maliciously or in bad faith. The Court can identify nine such references: that (1) Drs. Brakebill and Petty became resentful toward Dr. Moore for his various complaints, and developed animus and malice toward him; (2) a reference to Dr. Moore's submission of a complaint to the Illinois Department of Financial and Professional Regulations stating that defendant Health Plan had "intentionally and maliciously committed fraud"; (3) the allegation in Dr. Moore's complaint that defendants Health Plan and Dr. Petty "continued to maliciously pursue" him after he submitted sworn affidavits from allegedly complaining patients who had not had contact with Dr. Moore; (4) an allegation that defendants' "actions and efforts to violate their contractual obligation to Dr. Moore, CHCCI, and the physician employees of CHCCI were intentional and malicious"; that (5) defendants published knowingly false and defamatory statements to TennCare officials, various individuals and patients, and federal data bank entities in "bad faith and with actual malice"; that (6) defendants intentionally and maliciously interfered with Dr. Moore's contractual and business relationships with existing patient members of defendant Health Plan, other third party payor programs and health plans, and their patients, both within and outside of the TennCare program, including John Deere Health Care Inc.'s private health insureds; that (7) defendants knew, and intended, that their "malicious" actions would interfere with Dr. Moore and CHCCI's other physician employees' contractual and business relationships with patients who are members of defendant Health Plan and patients who are members of third party payor programs and other health plans; that (8) defendants "intentionally and maliciously"

fabricated false information to substantiate their desire to take adverse action against Dr. Moore; and that (9) defendants' actions and efforts to violate their contractual obligation to Dr. Moore, CHCCI, and the physician employees of CHCCI were "intentional and malicious" [Doc. 1, ¶¶ 23, 60, 61, 97, 105, 106, 108, 139, 143].

Even viewing these allegations in the light most favorable to Dr. Moore, the Court finds that Dr. Moore has failed to offer sufficient evidence to create a genuine issue of material fact as to whether the peer review action in this case was motivated by bad faith or malice. It is well settled that, to survive summary judgment, the non-moving party must point to evidence in the record upon which a reasonable finder of fact could find in its favor. *Anderson*, 477 U.S. at 248. Mere "[c]onclusory statements unadorned with supporting facts are insufficient to establish a factual dispute that will defeat summary judgment." *Alexander v. CareSource*, 576 F.3d 551, 560 (6th Cir. 2009).

The above-cited references to bad faith and malice in plaintiffs' complaint consist principally of speculative assessments of defendants' motives in taking the peer review action against Dr. Moore. And the proof Dr. Moore has offered in support of these allegations is not colorable. Such evidence consists solely of the following testimony from his deposition:

> Q.    Have you ever heard anyone say that they were acting to retaliate against you?
>
> A.    A John Deere person, I might have heard that secondhand, yes.
>
> Q.    From who?

A.    Various Tenn-Care officials.

Q.    Told you what?

A.    That watch out, John Deere is after you.

Q.    Who?  Who is–

A.    I don't remember their name right now.  I heard that.  I have heard patients tell me that.

. . . .

Q.    How would patients know?

A.    Because when they call in on the phone–and I had one particular example, I had a patient come in and would say, well, did you guys make a complaint?  No, not really.  And, you know, she went on to explain the attitude of the people down there at that little John Deere office.

Q.    Okay; explaining an attitude.  Did anyone ever tell you that someone from John Deere told them that they were acting to retaliate against you; they wanted to cancel the contract?

A.    If you want something specific, like someone coming in and saying–raising their hand and saying, yes, I told Dr. Moore that John Deere is after him, that–you are not going to find that.  But there is probably a good deal of other type of information that would suggest that that's exactly what they were doing, yeah.

Q.    I want to know what that information is.

A.    Right.

. . . .

> Q. Okay. So other than what you have told me now, you just have a general presumption that they acted to retaliate against you?
>
> A. Yeah.

[Doc. 40]. Conclusory, secondhand patient reports like these cannot suffice to create a genuine issue of material fact. Dr. Moore has thus failed to offer enough evidence to overcome the presumption of immunity afforded to peer review actions under the TPRL.

Although the applicability of the HCQIA and the TPRL renders defendants immune from money damages in this case, defendants are not immune from the imposition of injunctive relief. The Court thus considers on summary judgment Dr. Moore's claims to the extent those claims request injunctive relief. *See Mathews*, 883 F. Supp. at 1035 ("[S]ince the [HCQIA] does not provide immunity from suit or from injunctive or declaratory relief, plaintiff's claims remain viable to the extent he seeks non-damage remedies.").

**B.      Whether Dr. Moore's Claims Can Withstand Summary Judgment**

The Court considers each of Dr. Moore's claims below.

**1.      Defamation**

Dr. Moore first alleges a claim for defamation [Doc. 1, ¶¶ 92-98]. As the basis for this claim, Dr. Moore alleges that:

(1)      Defendant Health Plan's Quality Improvement Department published knowingly false statements to TennCare officials, various individuals, and patients to the effect that Dr. Moore had "quality of care issues" based upon the patient complaints defendants attributed to Dr. Moore;

(2)      Dr. Petty knowingly published a false and defamatory adverse action report to the NHIPDB;

33

(3)     Defendants knew that the statements and report just described were false, because Dr. Moore provided Dr. Petty with copies of signed statements from patients identified by defendants as having made complaints against Dr. Moore, along with other evidence;

(4)     These signed statements evidenced that Dr. Moore was not the treating physician, and that many of the complaining patients had never seen Dr. Moore; and that

(5)     Defendants' actions to publish the knowingly false and defamatory statements to TennCare officials, various individuals, patients, and federal data bank entities were taken in bad faith and with actual malice.

[*Id.*, ¶¶ 92-97]. Dr. Moore alleges that he and his practice have suffered as a result of these actions [*Id.*, ¶ 98].

The elements of a cause of action for defamation in Tennessee are that (1) a party published a statement; (2) with knowledge that the statement is false and defaming to another; or (3) with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statement. *Sullivan v. Baptist Mem'l Hosp.*, 995 S.W.2d 569, 571 (Tenn. 1999). Truth is an absolute defense to defamation, but only when the defamatory meaning conveyed by the words is true. *Memphis Publ'g Co. v. Nichols*, 569 S.W.2d 412, 420 (Tenn. 1978).

Defendants contend that plaintiffs' claim for defamation must fail as a matter of law, because it is based on communication to TennCare officials and various individuals and patients indicating that Dr. Moore's contracts had been canceled because of quality of care issues, and because that communication is true [Doc. 40]. Defendants further contend that Dr. Moore's own deposition testimony demonstrates that Dr. Moore had no proof that any

of the challenged statements were made with knowledge that they were false, or were made in reckless disregard of the truth [*Id.*].

Dr. Moore contends that the statements Dr. Moore challenges were not true, and that defendants acted with reckless disregard for the truth in publishing them [Doc. 43]. Dr. Moore contends further that the communications to third parties stating that Dr. Moore's contract was terminated because of quality of care issues were defamatory in that they were made in the absence of an investigation by John Deere of the patients' complaints [*Id.*]. Finally, Dr. Moore contends that defendants acted with reckless disregard for the truth in that after the defendants received the signed patient statements from Dr. Moore, defendants continued to pursue professional review actions against Dr. Moore, and did not determine who was treating the patients when the complaints were made [*Id.*].

The Court finds summary judgment to be appropriate as to Dr. Moore's defamation claim. Dr. Moore places great weight on the specific language of the communications at issue, arguing that references that the contracts in this case were terminated as a result of complaints against Dr. Moore, rather than as a result of complaints against other physicians working with Dr. Moore, are defamatory. But Dr. Moore has failed to offer proof that these statements were made with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statements. To the contrary, the record demonstrates that Dr. Moore raised these arguments to defendants; that defendants considered Dr. Moore's arguments in full; and that defendants still rejected them [*see* Doc. 39-2; Doc. 39-5; Doc. 39-7; Doc. 39-9].

Moreover, even were Dr. Moore able to establish all of the elements of a defamation claim, defendants can raise a valid truth defense. Dr. Moore's defamation claim relates to two categories of communications: (1) statements to TennCare officials, various individuals, and patients to the effect that Dr. Moore's contract was being terminated for quality of care issues; and (2) Dr. Petty's publication of an adverse action report with the NHIPDB in connection with the termination of that contract. But Dr. Moore's contract was terminated for quality of care issues, pursuant to the findings of the peer review panel in this case [Doc. 39-7; Doc. 39-9]. And the adverse action report memorialized that finding [Doc. 39-10]. Defendants' communications are thus insulated by their truth from attack by Dr. Moore.[10]

Summary judgment as to Dr. Moore's defamation claim is therefore appropriate. The Court now considers plaintiffs' claim of tortious intentional interference with current business relationships.

## 2. Tortious Intentional Interference with Current Business Relationships

Plaintiffs next allege a claim of tortious intentional interference with current business relationships [Doc. 1, ¶¶ 99-128]. As the basis for this claim, plaintiffs allege that:

---

[10] Defendants are also likely immune from a defamation claim made in connection with their filing of an adverse action report because the regulations implementing that reporting requirement provide an exclusive mechanism for challenging the filing of such a report: filing an appeal with the Secretary of Health and Human Services. *See* 45 C.F.R. § 61.15 (1999). Dr. Moore filed such an appeal in this case, and was permitted to include a comment in the report noting his objection to the report [Doc. 39-2, ¶ 25]. Defendants were not ordered by the Secretary to take down the report [*Id.*].

(1)     Defendants intentionally and maliciously interfered with Dr. Moore's contractual and business relationships with existing patient members of defendant Health Plan by terminating Dr. Moore's provider agreement with defendant Health Plan;

(2)     Defendants intentionally and maliciously interfered with Dr. Moore's contractual and business relationships with other third party payor programs and health plans, and their patients, both within and outside of the TennCare program;

(3)     Defendants interfered with Dr. Moore and CHCCI's other physician employees' contractual and business relationships with patient members of defendant Health Plan, third party payor programs and health plans, and their patients, both within and outside of the TennCare program;

(4)     Defendants knew, and intended, that their malicious actions would interfere with Dr. Moore and CHCCI's other physician employees' contractual and business relationships with patients who are members of defendant Health Plan, and patients who are members of third party payor programs and other health plans, within and outside the TennCare program, and to harm Dr. Moore's ability to maintain and enter into such contracts and business relationships in the future; and that

(5)     Defendants intentionally and maliciously interfered with CHCCI's contractual and business relationships with employee physicians of CHCCI by notifying patient members of defendant Health Plan that they could no longer receive covered medical services rendered at CHCCI and preventing them from seeking treatment from other defendant Health Plan credentialed physicians who were employees of CHCCI.

[*Id.*, ¶¶ 105-08, 122]. Dr. Moore alleges that, as a direct and proximate result of defendants'

actions:

(1)     Defendant Health Plan patients, and patients who are members of other third party payor programs and other health plans, both within and outside the TennCare program, have been induced to terminate their contractual and business relationships with Dr. Moore and CHCCI;

(2)    Dr. Moore and CHCCI are no longer able to treat and service patients who are members of defendant Health Plan, or are John Deere Health Care Inc.'s private health insureds, and who are members of other third party payor programs and other health plans;

(3)    Dr. Moore and CHCCI have lost a significant number of patients who are members of third party payor programs and other health care plans;

(4)    Several CHCCI employee physicians terminated their contractual and/or business relationship with CHCCI at least partly because of defendants' actions;

(5)    Dr. Moore has been stigmatized and injured in his ability to contract with new insurance companies and programs;

(6)    Dr. Moore has become, or fears that he may become, unemployable as a provider of medical services;

(7)    It is difficult for Dr. Moore to obtain malpractice insurance, and then only at enhanced rates; and

(8)    CHCCI has been injured in its business.

[*Id.*, ¶¶ 109-14, 123-28].

Tennessee courts treat claims for tortious intentional interference with current business relationships like they treat claims for procurement of a breach of contract. *Myers v. Pickering Firm, Inc.*, 959 S.W.2d 152, 18 (Tenn. Ct. App. 1997). The elements of a cause of action for procurement of a breach of contract in Tennessee are that (1) there is a legal contract; (2) the wrongdoer has knowledge of the existence of the contract; (3) there must be an intention to induce its breach; (4) the wrongdoer must have acted maliciously; (5) there must be a breach of the contract; (6) the act complained of must be the proximate cause of

the breach of the contract; and (7) there must have been damages resulting from the breach of the contract. *Id.*

Defendants contend that plaintiffs' claim must fail because it is "predicated upon unsubstantiated allegations that John Deere induced other third party payment providers to terminate their agreements with [p]laintiffs" [Doc. 40]. Defendants further contend that Dr. Moore's own deposition testimony, reproduced below, demonstrates that, contrary to plaintiffs' allegations, no breach of any third party payment contract ever occurred:

> Q.    Were any of these relationships that you pointed to here, were any of those actually terminated because–
>
> A.    Related to the John Deere?
>
> Q.    Yes.
>
> A.    Terminate–no.  No, they weren't.  But that's–that's just extreme damage.    There is all different–there is contrasts–
>
> . . . .
>
> Q.    As you sit here today, you can't tell me that any actually ended because of John Deere's actions?
>
> A.    Right.

[Doc. 39-1].

Plaintiffs respond that Dr. Moore has satisfied all of the elements for a tortious intentional interference with business relationships claim because:

(1)    He had contractual relationships with patients;

(2)    Defendants knew that Dr. Moore had patients;

(3)   Defendants intended to induce the breach of contract with Dr. Moore's patients by terminating his provider agreement on the premise of quality of care issues from complaints of patients whom Dr. Moore did not treat;

(4)   A reasonable trier of fact could find that defendants acted with malice in terminating the contracts;

(5)   There was an actual breach because patients stopped coming to CHCCI, which caused

(6)   Damages, in that Dr. Moore closed his clinics and experienced a substantial financial loss.

[Doc. 43].

The Court agrees with defendants. Plaintiffs misapprehend the nature of this cause of action. As defendants point out in their reply, *see* Doc. 44, a "party to a contract cannot be held liable for procuring the breach or termination of its own contract." *Ladd v. Roane Hosiery*, 556 S.W.2d 758, 760 (Tenn. 1977). In arguing that "[d]efendants maliciously interfered with Dr. Moore's contractual and business relationships with existing patient members of [d]efendant Health Plan by terminating Dr. Moore's provider agreement," *see* Doc. 43, that is precisely what plaintiffs allege here.

Were plaintiffs to point to some evidence in the record indicating that defendants induced a breach of plaintiffs' contracts with third parties, and that a breach actually occurred, summary judgment would be inappropriate on this claim. *See Anderson*, 477 U.S. at 248 (non-moving party must point to evidence in the record upon which a reasonable finder of fact could find in its favor to withstand summary judgment). But plaintiffs have not done this. Instead, they merely recite in their motion papers the same allegations they set

40

forth in their complaint [*see* Doc. 43].[11]  Summary judgment is therefore appropriate on

plaintiffs' tortious intentional interference with current business relationships claim.

The Court now considers plaintiffs' breach of contract claim.

### 3.      Breach of Contract

Dr. Moore next alleges a breach of contract claim [Doc. 1, ¶¶ 129-48].  As the basis

for this claim, Dr. Moore alleges that:

(1)     Defendants Health Plan and Dr. Petty breached the provider agreement by terminating it purportedly for cause, without listing any circumstances that constituted breach, without affording an opportunity to cure any alleged breach, and with fewer than sixty (60) days' prior written notice;

(2)     Defendants breached the provider agreement by terminating without cause without providing six (6) months' prior written notice;

(3)     Defendants breached the provider agreement by failing to provide Dr. Moore, CHCCI, and the other physician employees of CHCCI with the due process review rights afforded to them under the provider agreement; and

(4)     Defendants breached the provider agreement by notifying the patients of other CHCCI physicians that those patients could no longer obtain medical services at CHCCI.

[*Id.*, ¶¶ 129-41].  Dr. Moore alleges that, as a direct and proximate result of defendants'

actions:

---

[11] The only piece of evidence conceivably supporting plaintiffs' claim that an actual breach occurred is that "patients stopped coming to CHCCI" [Doc. 43].  No reasonable finder of fact could find in plaintiffs' favor solely on the basis of this conclusory allegation.

(1)  Dr. Moore, CHCCI, and the physician employees of CHCCI are no longer able to treat and service patients who are members of defendant Health Plan;

(2)  Dr. Moore has become or fears that he may become unemployable as a provider of medical services;

(3)  CHCCI has had to close its business;

(4)  It is difficult for Dr. Moore to obtain malpractice insurance, and then only at enhanced rates; and that

(5)  Dr. Moore and CHCCI have been injured in their business.

[*Id.*, ¶¶ 144-48].

Defendants contend that plaintiffs' breach of contract claim must fail because the terms of Dr. Moore's TennCare provider agreement and the terms of the Knoxville Single HMO Fund provider agreement permit the immediate termination of those agreements without prior notice if John Deere "reasonably determined that continuation of the agreement or continuing participation of the [c]ontracting provider might negatively affect member care" [Doc. 40]. Defendants contend that this is what John Deere did in this case, and that plaintiffs have offered no proof to the contrary [*Id.*].

The Court need not dwell on Dr. Moore's breach of contract claim, which arises from the peer review action in this case. As the Court has found *supra* Part III.A, defendants are immune from claims seeking money damages arising from that peer review action. *See Curtsinger*, 2007 WL 1241294, at *13 ("[T]he HCQIA shields health care entities and individuals from liability for damages for actions performed in the course of monitoring the competence of health care personnel."). And "damages are always the default remedy for

breach of contract." *United States v. Winstar Corp.*, 518 U.S. 839, 885 (1996); *see also Riverside Park Realty Co. v. FDIC*, 465 F. Supp. 305, 316 (M.D. Tenn. 1978) ("[C]laims arising from . . . breach of contract are, of course, of the type that are normally adequately remediable by an award of damages and not the type for which injunctive relief is usually available."). Because Dr. Moore could not recover damages on his breach of contract claim even were he to satisfy all of the elements of that claim, summary judgment on that claim is appropriate as well.

The Court lastly considers Dr. Moore's claim for injunctive relief.

### 4.    Injunctive Relief

Dr. Moore has also raised a claim for "injunctive relief" [*Id.*, ¶¶ 149-59]. The Court notes that "injunctive relief" is not a separate cause of action, but is instead a form of equitable relief. Because there are no claims remaining in this case upon which such relief could be granted, the Court need not consider it further.

## IV.    Conclusion

For the reasons set forth above, defendants' motion for summary judgment [Doc. 39] will be granted. This case will be dismissed

An order reflecting this opinion will be entered.



s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE